UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIE GODDARD,
as Personal Representative of the Estate of
DANIELLE C. MAUDSLEY,

    Plaintiff,                               CASE NUMBER: 8:14cv1798 EAK TBM

v.

THE FLORIDA HIGHWAY PATROL, a
division of Florida Department of Highway
Safety and Motor Vehicles,
TROOPER DANIEL COLE,
TASER INTERNATIONAL, INC., and
DGG TACTICAL SUPPLY, INC.
f/k/a DGG TASER, INC.

    Defendants.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFEDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS

COMES NOW the Plaintiff, JULIE GODDARD as Personal Representative of the Estate of DANIELLE C. MAUDSLEY ("Maudsley"), by and through the undersigned attorneys, and pursuant to Fed. R. Civ. P. 56(a) hereby files her response in opposition to Defendant Trooper Daniel Cole's ("Cole") motion for summary judgment on Counts VII and VIII of Plaintiff's second amended complaint.

**Facts**

1

On September 19, 2011, at 10:28 a.m.[1], Cole arrested Maudsley for two counts of leaving the scene of a crash[2] and two counts of driving with no valid driver's license[3]. *Office of Inspector General Investigation Report*, Jan. 10, 2012, at 8, attached hereto as Exhibit B. When Cole took possession of Maudsley, she was already handcuffed in the front of her body by a Pinellas County Sheriff's Deputy. *Id*. Cole handcuffed Maudsley behind her back and transported her to the FHP station in Pinellas Park. *Id*. On the way to the station, Cole activated his patrol car camera. *Florida Highway Patrol Supervisor's Use of Control Report*, at 3. He "went to the FHP Station instead of the county jail because he had a large amount of paperwork to complete, there is no printer available inside of the jail, there is limited reception for his Mobile Data Computer inside of the jail, and the workspace inside of the jail is extremely small. " *Office of Inspector General Investigation Report*, at 8.

Cole and Maudsley arrived at the FHP station at 11:04 a.m. *Id*. at 2. When Cole opened the rear door of his patrol car to escort Maudsley into the station, her right hand was out of the handcuff and she stated "I took this off." *Id*. Cole secured the handcuffs behind Maudsley's back and escorted her into the conference room of the station." *Id*. Cole placed Maudsley in a chair that was furthest away from the conference room door. *Id*. Cole sat at a table between Maudsley and the exit door. *Id*. at 9. At some point, unbeknownst to Cole, Maudsley placed her handcuffs in front of her. *Id*. at 2.

---

[1] *Florida Highway Patrol Supervisor's Use of Control Report*, Sept. 30, 2011, at 3, attached hereto as Exhibit A.

[2] These charges are second degree misdemeanors under Florida Statute 316.061.

[3] These charges are second degree misdemeanors under Florida Statute 322.03.

At approximately 11:45 a.m., Maudsley ran past Cole out the exit door of the conference room. *Id*. at 2. At 11:45:44 hours, Cole asked, "where are you going?" He then whistled and got out of his chair. *Id*. at 3 and 9. Cole began running towards Maudsley. *Id*. at 9. As Cole reached the conference room's exit door, Maudsley had already reached the exit door of the station. *Id*. The door is a heavy metal door with a push bar. *Florida Highway Patrol Supervisor's Use of Control Report*, at 3. The door slowed Maudsley down and Cole was able to close in. *Office of Inspector General Investigation Report*, at 9. Maudsley made it out of the exit door as the door was closing on Cole. *Id*. Cole pushed the door open and drew his Electronic Control Device (ECD). *Id*.

At 11:45:50 hours, Cole fired his ECD at Maudsley's back. *Video from Trooper Cole's patrol car camera*, Sept. 19, 2011 at 11:45:50, attached hereto as Exhibit C in still image. Cole's ECD was a TASER X26 Cartridge. *Office of Inspector General Investigation Report*, at 2. After the probes hit Maudsley, her body rotated. *Video from Trooper Cole's patrol car camera*, at 11:45:50 - 51. She fell backwards and hit her head on the asphalt. *Id*. at 11:45:52. As a result of Cole's use of his ECD on Maudsley, she suffered extensive traumatic brain injury and remained in a vegetative state until her death on September 15, 2013. Second Am. Comp. ¶ 14 (Docket No. 22).

Cole attended ECD training on April 2, 2009. *Office of Inspector General Investigation Report*, at 5. Defendant Cole signed a document prepared by TASER International, Inc. and titled Instructor and User Warnings, Risks, Liability Release and Covenant Not to Sue. April 2, 2009 at 2, attached hereto as Exhibit D. The document contains the following information regarding secondary injury risks:

> TASER-induced strong muscle contractions usually render a subject temporarily unable to control his or her psychomotor movements. This may result in secondary injuries such as those due to falls. This loss of control, or inability to catch oneself, can in special circumstances increase the risk(s) of serious injury or death. ... [p]ersons who could … suffer impact injuries to their head or other sensitive area in a fall could also be at higher risk. Other persons at higher risk include: … those who are running.

*Id*. at 2.

On December 29, 2011, a digitally recorded sworn statement was conducted of Cole at the Florida Highway Patrol Station in Pinellas Park. *Office of Inspector General Investigation Report*, at 8. A synopsis of the statement is contained in the Investigation Report of the Office of Inspector General. *Id.* at 8-9. Cole stated that he did not give a verbal warning prior to deploying his ECD due to the immediacy of needing to stop Maudsley. *Id.* at 9. He also stated that he did not consider that Maudsley could fall on the asphalt and hurt herself. *Id.*

A supervisory review of Defendant Cole's use of his ECD against Maudsley was performed. *Florida Highway Patrol Supervisor's Use of Control Report*, 1- 6. Three of Cole's supervisors who reviewed his actions involving the use of his ECD against Maudsley **concluded that the amount of force used by Cole was not justified**. *Id*. at 6. (emphasis added).

Cole's District Shift Commander, Lieutenant Harold E. Frear, wrote: "Based upon my review of the totality of the circumstances I believe the force used exceeded the minimum force necessary to apprehend the suspect and / or deviate from policy." *Id*. Cole's District Commander wrote: "Agreed, more than necessary, could have used alternative action." *Id*.

Cole's Trooper Commander, J.R. Freeman, wrote: "Based on my review of the attached documents, and the totality of the incident, I believe the force used exceeded the minimum amount of force needed to affect the arrest / apprehension of Ms. Maudsley." *Id*.

Further, Sgt. Raymond O. Ada, who investigated Cole's actions, noted in the Use of Control Report that "it appears in the video that the opportunity to render a warning was available to Trooper Cole." *Id*. at 5.

The Office of Inspector General performed an administrative investigation and determined:

> Cole acted in accordance with Florida law and FHP Policy, both of which state that a law enforcement officer is justified in the use of any force which he or she reasonably believes to be necessary to prevent the escape of an arrested person in custody. Although the FHP Policy on Electronic Control Devices states that a member should not use the device on a handcuffed prisoner, it also provides that there may be situations that conflict with this policy.

*Office of Inspector General Investigation Report*, at 11. Conflict situations are addressed in the Note following The Florida Highway Patrol Policy Numbers 10.05.04 C1. (a)-(f). *Florida Highway Patrol Policy*, Feb. 1, 2009, No. 10.05.04 C1. (a)-(f) Note, attached hereto as Exhibit F. The Note recognizes conflicts, however, it requires that the use of the ECD be based on justifiable facts and subject to "Use of Control" supervisory review. **Importantly, the Office of Inspector General's Investigation Report does not mention a review of the Supervisor's Use of Control Report wherein Cole's supervisors concluded that the amount of force used by Cole was not justified.**

## Florida Highway Patrol Policy

Florida Highway Patrol Policy Number 10.01 governs use of control and response to resistance. The Florida Highway Patrol is granted authority to use control techniques in accordance with Chapter 776 of the Florida Statutes. *Florida Highway Patrol Policy*, Feb. 1, 1996, No. 10.01.02, attached hereto as Exhibit E.   Notwithstanding, The Florida Highway Patrol Policy is more restrictive than Florida Statutes. *Id*. at No. 10.01.02, page 3 (*see* WARNING).

Section 776.07 of the Florida Statutes applies to use of force to prevent escape and provides that "a law enforcement officer or other person who has an arrested person in his or her custody is justified in the use of any force which he or she reasonably believes to be necessary to prevent escape of the arrested person from custody." *Id*. at No. 10.01.02 B5, page 2.

The Florida Highway Patrol Policy objectives include "[t]o ensure that members of the Florida Highway Patrol employ the amount of force that is ***necessary and reasonable*** to prevent escape, overcome resistance and effect arrests during the performance of their official duties." *Id*. at No. 10.01.05 A, page 5 (emphasis added).

The Policy procedures provide that: "[m]embers of the Florida Highway Patrol ***shall in every instance*** seek to employ the minimum amount of control required to successfully overcome physical resistance, prevent escapes, and effect arrests." *Id*. at 10.01.07, page 6 (emphasis added).   "**Members' actions must be objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.**" *Id*.

The Policy procedures provide for types of control and applications from identification to deadly force. Id. at pages 6-7. The second type of control listed is "WARNING" and provides that "[w]henever possible, members shall exercise persuasion, advice and /or warning of the impending use of control." *Id*. at 10.01.07 A2, page 6.

Policy Number 10.05 applies to Electronic Control Devices (ECD) and sets forth the use, carrying, certification and reporting requirements. *Florida Highway Patrol Policy*, Feb. 1, 2009, No. 10.05.01, page 1, attached hereto as Exhibit F. It provides that: '[i]n accordance with Section 943.1717(1), Florida Statutes, a member's decision to deploy the ECD shall involve an arrest or custodial situation during which the person who is the subject of the arrest or custody escalates resistance to the member from passive physical resistance to active physical resistance, and the person: (a) Has the apparent ability to physically threaten the member or others; or (b) Is preparing or attempting to flee or escape. **(NOTE: Fleeing cannot be the sole reason for deployment of the ECD.)"** *Id*. at 10.05.04 C, page 5. The deployment provisions further provide that unless exigent circumstances exist, members **"shall not"** use the ECD on a handcuffed prisoner. *Id*. at 10.05.04 C1 (b), page 6. However, the provisions note that there may be incidents in which the use of the ECD conflicts with that provision and requires that in those cases, the use of the ECD shall be based on justifiable facts and are subject to "Use of Control" supervisory review. *Id*. at 10.05.04 C1 (a)-(f) Note, page 6.

The deployment provisions warn members that "[p]ersons of small build regardless of age" may be more susceptible to injury when an ECD is used against them. Florida Highway Patrol Policy 10.05.04 C2 (c), page 6. The provisions provide that "[w]hen reasonable,

members preparing to fire the device should announce a verbal warning such as, 'Stop Resisting, Taser!, Taser!, Taser!'" *Id*. at 10.05.04 C4, page 6.

## MEMORANDUM OF LAW AND ANALYSIS

### Summary Judgment Standard

Summary judgment is appropriate only when the evidence before the court demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The evidence must be viewed in the light most favorable to the nonmoving party.  *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002) (citing *Augusta Iron and Steel Works, Inc. v. Employers Ins. Of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988)).

### Qualified Immunity

Qualified immunity "balances two important interests – the need to hold public officials accountable ***when they exercise power irresponsibly*** and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (emphasis added).   To receive qualified immunity, the law enforcement officer " 'must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." ' "  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citing *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).   To meet his burden, the law enforcement officer, must demonstrate that he was (1) "performing a legitimate job-related function (that is, pursuing a job-related

goal)" and (2) "through means that were within his power to utilize." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

"[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen within his legitimate job description." *Id*. at 1266. Under the second prong of the test, it is necessary to determine whether the law enforcement officer "is executing the job-related function – that is, pursuing his job-related goals - in an authorized manner." *Id*. "Each government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Id*. at 1267. Government employment "is not a *carte blanche* invitation to … achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*. Once the law enforcement officer shows that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the officer is not entitled to qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

In *Saucier v. Katz*, the United States Supreme Court set forth a two-part test to determine whether qualified immunity applies: 1) whether the facts support a constitutional violation, and 2) if so, whether that right was "clearly established" at the time of the incident." 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). Under *Saucier*, a court was required to analyze the two prongs in sequential order. *Id*. In *Pearson v. Callahan*, the United States Supreme Court held that the courts have discretion in deciding which of the two prongs to consider first. 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

### Constitutional Violation

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  (emphasis added).

In *Graham v. Connor*, the United States Supreme Court ruled that "[a]ll claims that law enforcement officials have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard…" 490 U.S. 386, 109 S.Ct. 1865, 1867 (1989).  To determine whether the use of force is "reasonable" under the Fourth Amendment, the Courts must carefully balance " ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake." *Id*. at 396, 1871 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 (1983)).  The test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.  at 396, 1872 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 1699-1700 (1985)).  The " 'reasonableness' " of the use of force must be considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 1879-1881 (1968)).  However, the

reasonableness of the use of force is based on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 1872 (citing *Scott v. United States*, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724 (1978)).

"[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of injury inflicted." *Lee v. Ferraro*, 1284 F.3d 1188, 1198 (11th Cir. 2002) (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)). The need for the application of force is dictated by *Graham* which holds that "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Id.*

### Clearly Established Right

"'[C]learly established' for purposes of qualified immunity means '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question had previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Wilson v. Layne*, 526 U.S. 603, 614-15, 119 S.Ct 1692, 1699 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct 3034 (1987)). "Exact factual identity with a previously decided case is not required." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

To determine whether a right is clearly established, the Eleventh Circuit has "held that decisions of the United States Supreme Court, the United States Court of Appeals for the

Eleventh Circuit, and the highest court of the pertinent state … can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1032 n. 10 (11th Cir. 2001)). A plaintiff may also show that a right is clearly established in a case of "obvious clarity". Under this exception, the officer's conduct " 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him], notwithstanding the lack of fact-specific case law.' " *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)). "Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law 'inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful.' " *Lee v. Ferraro*, 284 F.3d at 1199 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

To date, no decision from the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the Florida Supreme Court has clearly established that an officer's tasering, without warning, of a small, young, handcuffed woman in the back who was running on asphalt, when other means were available to stop her, constituted excessive force under like circumstances. Accordingly, we must analyze this case under the obvious clarity test.

### Analysis and Argument

### Discretionary Function Test

Cole passed the first step of the discretionary function test because he had the power to effectuate arrests.[4] Defendant Cole failed the second step of the discretionary function test because he executed the arrest, the job-related function, in an unauthorized manner.[5] Simply put, he was not authorized "to break the rules."

The evidence shows that there is a genuine dispute as to the material fact of whether Cole was acting within his discretionary authority. Accordingly, Cole is not entitled to qualified immunity.

### Constitutional Violation

Cole effected an unreasonable seizure of Maudsley in that the force used was excessive under the circumstances in violation of the Fourth Amendment. **Second Am. Comp. ¶¶ 62, 65 (Docket No. 22).** Maudsley was arrested for four (4) non-severe, second degree misdemeanors. She posed no immediate threat or danger to Cole or others. She did attempt to evade arrest by flight. However, a reasonable officer in Cole's circumstance would have followed the Florida Highway Patrol Policies and based his actions on his knowledge of secondary injury risks he was afforded through ECD training. The force used by Cole was far from proportionate to the need. Without warning, Cole tasered a small, young, handcuffed woman in the back who was running on asphalt despite the risk of serious injury or death to her. Cole had other, more reasonable means available to him to restrain Maudesly: namely just extending his arm out and grabbing her. As a result of Cole's unreasonable force, Maudsley suffered traumatic brain injury and subsequent death.

---

[4] *See* Second Am. Comp. ¶¶ 31 – 32, 40 – 41 (Docket No. 22).

[5] *See* Second Am. Comp. ¶¶ 21 a –g, 25 a-g, 33 a-g, 42 a- g (Docket No. 22).

13

### **Plaintiff Has Not Had an Adequate Time for Discovery**

Notwithstanding the evidence on the record supporting the denial of qualified immunity, discovery has yet to be completed beyond that associated with the initial filing of the complaint in state court. This primarily due to the delays associated with the death of Danielle Maudesly during the pendency of the state court action, and the delays associated with the establishment her estate and the appointment of a Personal Representative. The timeline of events are as follows:

The timeline of events are as follows:

1. September 20, 2013 through February 14, 2014: Probate efforts to establish estate and appoint Personal Representative; Parties agree to refrain from discovery until estate is established and amended complaint is filed;
2. July 3, 2014: Amended Wrongful Death Complaint is filed;
3. July 29, 2014: Notice of Removal to Federal Court;
4. August 13, 2014: Motion to Dismiss Amended Complaint;
5. August 30, 2014; Motion for Leave to File Second Amended Complaint;
6. September 19, 2014; Second Amended Complaint filed;
7. September 22, 2014: Case Management and Scheduling Order;
8. October 3, 2014: Answer & Affirmative Defenses filed by Cole;
9. October 3, 2014: Motion for Summary Judgment filed by Cole.

The pleadings in this case were formally closed on October 3, 2014, when Defendant Cole filed his answer and affirmative defenses to the Second Amended Complaint. Before that time, the issues had not been framed by the parties, and in order to avoid irrelevant

discovery, discovery was abated until the estate was established and the amended complaint was filed. Plaintiff has yet to have the opportunity to depose Trooper Cole, and other representatives of his employer in order to engage in such additional discovery as it relates to the qualified immunity and other issues.

It has been noted by this Court that "summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery." *Snook v. Trust Co. of Georgia Bank of Savannah,* 859 F.2d 865, 870 (11th Cir. 1988), *see also*, *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, 1145 (5th Cir.1973) (en banc), *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (noting the high fatality rate of summary dispositions at a time before the facts have been fully developed); *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Company,* 606 F.2d 602, 609 (5th Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 ("Summary Judgment should not, therefore, ordinarily be granted before discovery has been completed.").

## Conclusion

It is clear that upon applying the *Graham* standards to Cole's use of force against Maudsley, every reasonable officer would conclude that the force was unlawful. His blatant disregard to policy and training is egregious. Cole's actions elevated the force to excessive. In conclusion, on this summary judgment record, Maudsley has established a violation of the Fourth Amendment and that the violated right was clearly established. Accordingly, Cole is not entitled to qualified immunity on the claims of excessive force.

Notwithstanding the evidence on the record supporting the denial of qualified immunity, discovery has yet to be completed beyond that associated with the initial filing of

the complaint in state court due to the death of Maudesly, and the delays associated with the establishment her estate and the appointment of a Personal Representative. Plaintiff is currently trying to coordinate the deposition of Trooper Cole, and other representatives of his employer in order to engage in such additional discovery as it relates to the qualified immunity and other issues.

As a result, should this Honorable Court find the evidence in the record insufficient to rebut the motion for summary judgment presented by Cole, Plaintiff respectfully requests this Court deny the motion until Plaintiff has had an adequate opportunity for discovery.

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF or E-Service to Todd B. Miller, Counsel for The Florida Highway Patrol and Trooper Daniel Cole, on this 27th day of October, 2014.

*/s/ Ralph M. Guito III*
Ralph M. Guito III, Esq.
FBN: 832560
MCINTYRE THANASIDES BRINGGOLD
GRIMALDI & GUITO, P.A.
501 E. Kennedy Boulevard, Suite 1900
Tampa, FL33602
(T) 813-899-6059; (F) 813-899-6069
Primary Email: servicepi@mcintyrefirm.com
Secondary Email: ralph@mcintyrefirm.com

*/s/ Jennifer Ann Burns*
Jennifer Ann Burns, Esquire
Florida Bar No.: 382190
Carlson, Meissner, Hart & Hayslett, P.A.
250 Belcher Road North, Suite 102
Clearwater, FL 33765
(T) 727-443-1562; (F)727-462-2405
jburns@carlsonmeissner.com
*Attorneys for Plaintiff*