# Exhibit B



**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**



## Investigation Report

Case #:  20110547

### Investigative Predicate

On September 19, 2011, Trooper Daniel A. Cole arrested Danielle C. Maudsley for two counts of driving without a valid license and two counts of leaving the scene of a crash involving property damage. While Cole was completing arrest paperwork at the Florida Highway Patrol (FHP) Station in Pinellas Park, Maudsley attempted to escape. As Maudsley exited the FHP Station, Cole utilized his TASER electronic control device (ECD) on Maudsley. Maudsley fell onto the parking lot, which caused her skull to fracture. Emergency Medical Service (EMS) personnel transported Maudsley to the hospital where she was diagnosed with an occipital skull fracture and brain damage.

The Florida Department of Law Enforcement (FDLE) conducted an investigation into the use of force used by Cole pursuant to Section 776.05 Florida Statutes (2011). The FDLE investigation concluded that Cole was in the legal performance of his official law enforcement duties and acted within the scope of his assignment. According to FDLE, its investigation determined that the use of force by Cole was within the allowable parameters provided in Chapter 776, Florida Statutes (2011).

At the conclusion of the FDLE investigation, the FHP Office of Professional Compliance requested an administrative investigation be conducted by the Office of Inspector General (OIG) in reference to Cole's use of control on an escaping prisoner. The case was assigned to OIG Lieutenant Harold E. Schweinsberg for administrative investigation on November 28, 2011.

### Investigative Narrative

An investigation was initiated to determine if Cole violated Department policies.

While investigating the allegations, consideration was given to the following FHP and Department of Highway Safety and Motor Vehicles (DHSMV) policies:

- FHP Policy 3.03 (Code of Conduct: Regulations)
- FHP Policy 10.01 (Use of Control/Response to Resistance)
- FHP Policy 10.05 (Electronic Control Device)
- DHSMV Management Policy 3.06 Disciplinary Process (Standards of Conduct)

Upon assignment of this investigation, Schweinsberg reviewed the Investigative Report completed by Special Agent Patricia Thompson of the FDLE Tampa Bay Regional Operations Center Public Integrity Squad (**Exhibit #1**). The following is a synopsis of the report:




**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

On September 19, 2011, at approximately 9:11 AM, Cole was dispatched to a hit and run traffic crash scene at 102nd Avenue North and 98th Street in Pinellas County. While Cole was responding to the crash location, a second hit and run traffic crash was reported at Starkey Road and Bardmoor Boulevard in Pinellas County. The tag numbers, vehicle descriptions and driver descriptions were consistent in both crashes.

Pinellas County Sheriff's Office (PCSO) Deputies Chad Earl and Ryan Meyer responded to the address listed on the suspect vehicle's registration. When they arrived at 8509 Portulaca Avenue in Pinellas Park, they observed damage on the suspect vehicle that was parked at the residence. Earl observed a female that matched the suspect's description through an open door. The suspect, later identified as Maudsley, made spontaneous statements to Earl that indicated she was the hit and run driver.

Cole responded to Maudsley's residence and arrested her for two counts of driving without a valid license and two counts of leaving the scene with property damage. Cole handcuffed Maudsley behind her back and transported her to the FHP Station located at 7651 US 19 North in Pinellas Park, so he could complete his paperwork prior to transporting her to the jail. Cole activated his in-car video camera system to make a video and audio recording of the time he was with Maudsley because she was a female prisoner and to document any other violations she might commit.

Cole arrived at the FHP Station with Maudsley at 11:04 AM. When Cole opened the rear door of his patrol car to get Maudsley out she stated, "I took this off." Maudsley's right hand was no longer inside of the handcuff. Cole secured the handcuffs behind Maudsley's back once again and escorted her into the conference room of the FHP station. Cole had Maudsley sit in a chair that was furthest away from the conference room door. Cole sat a conference room table that placed himself between Maudsley and the door.

At approximately 11:41 AM, FHP Sergeant Raymond Ada arrived at the FHP station and watched Maudsley so Cole could use the restroom. Cole returned one and a half minutes later and assumed control of Maudsley. Ada left the conference room.

At approximately 11:45 AM, while Cole was completing his paperwork, Maudsley ran past him out of the conference room, down a short hallway, to the exit door that led into the parking lot. Cole chased after Maudsley and drew his ECD (TASER X26 Cartridge, serial number X00-138371) as she ran out of the exit door. Cole pursued Maudsley out the exit door and fired his ECD striking her in the back, as she ran into the parking lot. After the probes struck Maudsley, her body rotated, she fell backwards and her head hit the asphalt. Prior to her attempted escape, Maudsley had moved her handcuffs from the rear of her body to the front of her body without being detected by Cole or Ada.

Cole notified dispatch of his ECD deployment. Ada and the late Trooper William Dyer heard the radio transmission and responded to the parking lot from inside the FHP station to assist Cole.

Maudsley was bleeding from the back of her head, but she continued moving and talking. Cole told her to remain still and called EMS. Cole stayed with Maudsley as Dyer and Ada assisted with first reponder services until EMS arrived, approximately four minutes after they were called.

 

**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

Maudsley lost consciousness. Cole checked Maudsley and noted that she was still breathing. Ada checked Maudsley and noted that she still had a pulse.

EMS treated Maudsley at the scene. Trooper Suzanne Conklin responded to the FHP Station when she heard Cole's radio transmission about the ECD deployment. Conklin escorted the ambulance to Bayfront Medical Center. Conklin left the hospital and notified Maudsley's mother of her condition.

At approximately 5:00 PM, OIG Lieutenant Bobby Collins responded to Bayfront Medical Center and directed FHP Corporals Robert Hinton and Douglas Guy to obtain photographs. The physician attending to Maudsley advised Collins that her condition was critical and her prognosis was not good due to the lack of activity in her brain. Collins also learned that Maudsley had oxycodone and cocaine in her system.

Since Cole left his in-car video camera recording once he reached the FHP Station, a significant portion of the events associated with this incident were captured on video. In addition, the video captured Maudsley with her right handcuff off, trying the door handle of the patrol car when she was being transported to the FHP Station after she was arrested. The video also captured her attempting to put the handcuff back on before Cole opened the patrol car door once they arrived at the FHP Station.

Cole's patrol car was parked outside the station with the in-car video and audio on and revealed the following information about the escape attempt:

- At 11:45:44 hours, Cole asked, "Where are you going?" And then he whistled. The sound of a door release bar could be heard.
- At 11:45:50 hours, Maudsley was observed running from the door onto the concrete pad, with Cole behind her with his ECD drawn. Cole fired his ECD at Madusley's back as she was running away from him, in the direction of US 19 North. Maudsley was able to make it onto the asphalt before she spun around and hit the back of her head on the asphalt.
- At 11:45:53 hours, Cole notified dispatch of an ECD deployment at the FHP Station and stated, "She was trying to run out the door." Maudsley moved her arms and her legs. Ada and Dyer appeared on the video.
- Maudsley was crying and sat up as Cole told her several times to lie down. Maudsley laid back down and continued crying. Cole called EMS.
- At 11:48:00 hours, Maudsley did not appear to move or make anymore sounds or movements. Cole checked her breathing and Ada checked her pulse.
- At 11:51:15 hours, EMS arrived on scene and began treating Maudsley.

The following photographs were captured from the in-car video camera and show the sequence of Maudsley's attempt to flee from the FHP Station to when her head hit the asphalt. The video is on file in the Office of Inspector General.



**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**










 **Department of Highway Safety and Motor Vehicles**
**Office of Inspector General** 

Cole attended ECD training on April 2, 2009. FHP Lieutenant Miguel A. Cendan and FHP Trooper John F. Sessa taught the class. According to the agenda, the training included the TASER X-26 Volunteer Exposure, TASER X-26 Video Training, Drills and Scenarios, and the FHP Electronic Control Device Policy. A review of the TASER X-26 Video Training revealed 11 videos where subjects were "tased" while standing on concrete, pavement or asphalt. One of the videos showed a subject standing on a porch near a set of steps. One video showed a subject running away and being "tased". That subject was running on grass, however it appeared that he fell onto a concrete sidewalk. The training session also included a PowerPoint Presentation that included the following slide:

## Disclaimer

TASER International (TASER) does not establish, recommend, or endorse any use of force procedures, policies, or tactics. TASER training materials may include videos or other information from outside sources which are utilized for illustrative purposes only to depict certain concepts or to facilitate discussions.

TASER does not recommend or endorse any of the procedures, techniques, tactics, or methods depicted or illustrated in these materials and disclaims any liability for any such practices.

© 1996-2007 TASER International, Inc. All Rights Reserved

All TASER X-26 training documents are contained in **Exhibit #2**.

The analysis of Cole's ECD report revealed that it was tested on a regular basis and was functioning properly. The report revealed that Cole's ECD was fired on September 19, 2011, at 11:45 AM, for a five second duration (**Exhibit #3**).

 

**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

PCSO Forensic Science Specialists Woody Miller and Rebecca D'Jimas conducted a forensic analysis of the FHP Station where the incident occurred. Based on the analysis, the following measurements were obtained with all distances being approximate:

- Chair on east wall where Maudsley was seated to the hallway just outisde the door of the conference room: 21.068 feet.
- Hallway, from just outside the conference room door, to the approximate point outside the buidling, on the concrete pad where Cole fired his ECD at Maudsley: 27.834 feet.
- Approximate point on the concrete pad where Cole fired his ECD to the point on the asphalt where Maudsley fell and fractured her skull: 15.217 feet.

The forensic analysis revealed that during her attempted escape, Maudsley was able to run approximately 64 feet prior to being hit by Cole's ECD. The photograph below was created using forensic analysis and depicts the area traveled by Maudsley during her attempted escape:



According to the FHP Policy on Use of Control and Response to Resistance, (10.01.02 B.5.a.), and Section 776.07, Florida Statutes (2011), use of force to prevent escape, a law enforcement officer or other person who has an arrested person in his or her custody is justified in the use of any force which he or she reasonably believes to be necessary to prevent the escape of the arrested person from custody.

According to the FHP Policy on the Electronic Control Device (10.05.04 C.), and Section 943.1717(1), Florida Statutes (2011), use of dart-firing stun guns, a law enforcement officer's

 

**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

decision to use an the ECD must involve an arrest or custodial situation during which the person who is the subject of the arrest or custody escalates resistance to the officer from passive physical resistance to active physical resistance, and the person:

> (a) Has the apparent ability to physically threaten the officer or others; or,
> (b) Is preparing or attempting to flee or escape.

The FHP Policy on the ECD (10.05.04 C.1.) also states that, unless exigent circumstances exist, the member shall not use the device in certain situations to include on a handcuffed or secured prisoner (noted as section "b" of the policy). However, there is a note listed at the bottom of the list of situations that reads:

"**NOTE:** There may be incidents in which the use of an ECD conflicts with (b) through (e) above. In those cases, the use of the ECD must be based on justifiable facts and are subject to "Use of Control" supervisory review."

All witnesses, including civilians, EMS and law enforcement personnel involved were interviewed by FDLE agents during the FDLE investigation. There were no witnesses to the actual use of force by Cole.

Ada did not recall if Maudsley was handcuffed while he was watching her so Cole could use the restroom. Ada did state that if she had not been handcuffed, it would have been unusual and he probably would have noticed.

After Maudsley had been "tased" and then fell unconscious, Ada checked her pulse by placing his fingers on her carotid artery. Ada confirmed that Maudsley had a pulse and that she was breathing.

The EMS witnesses were consistent in indicating the information provided to them by FHP personnel was reliable with their observations upon arrival. EMS personnel advised Maudsley was not conscious when they arrived but she had vital signs. EMS reported that she was handcuffed in the front when they arrived. EMS asked FHP to remove the handcuffs so they could provide medical services to Maudsley. Ada removed the handcuffs. EMS removed the ECD probes from Maudsley's back. EMS reported that Maudsley had a cut to the back of her head and that there was a small pool of blood on the ground where her head hit the asphalt.

Audio recordings of subject and witness interviews are contained in **Exhibit #4**.



Interview of Witness

All witnesses, including civilians, EMS and law enforcement personnel involved were interviewed by FDLE agents during the FDLE investigation. See **Exhibits #1** and **#4**.

 **Department of Highway Safety and Motor Vehicles**
**Office of Inspector General** 

## Interview of Subject

**Trooper Daniel A. Cole, Florida Highway Patrol, Troop C**

On December 29, 2011, a digitally recorded sworn interview was conducted with Cole at the Florida Highway Patrol Station in Pinellas Park. Cole's attorney, Joseph Ciarciaglino was also present. The following is a synopsis of Cole's statement, which contains paraphrasing:

Cole has been employed with the FHP as a State Trooper since 1998. Cole was a member of the FHP Auxiliary from 1997 to 1998. Cole also had previous law enforcement experience with Madeira Beach Police Department as a reserve officer from 1993 to 1995 and approximately six years of experience as a reserve officer with the United States Military.

Cole had one previous incident in which an arrested person attempted to escape. The prisoner was handcuffed and was able to escape from the back door of the patrol vehicle. Cole apprehended the prisoner as he attempted to run away.

Cole had a previous incident in which he deployed his ECD. On December 30, 2009 or 2010, Cole encountered a suicidal subject standing on the Sunshine Skyway Bridge in Pinellas County. Cole deployed his ECD on the subject who fell to the concrete. The subject was not seriously injured by the ECD or the fall.

On September 19, 2011, Cole arrested Maudsley for two counts of leaving the scene of a crash and two counts of driving with no valid driver's license. When Cole took possession of Maudsley, she was already handcuffed by a Pinellas County Sheriff's deputy. The deputy told Cole that Maudsley had attempted to evade them when they arrived at her house and that he was going to charge her with resisting arrest without violence. Cole took the handcuffs off Maudsley because the deputy had handcuffed her in the front. Cole placed the handcuffs on Maudsley with her hands behind her back. Cole double locked the handcuffs. **(OIG Note:** The process of double locking the handcuffs keeps the handcuffs from tightening any further. If they were not double locked, the handcuffs would continue to close in on the subject's wrists.)

Cole placed Maudsley in his patrol car and transported her to the FHP Station in Pinellas Park. Cole went to the FHP Station instead of the county jail because he had a large amount of paperwork to complete, there is no printer available inside of the jail, there is limited reception for his Mobile Data Computer inside of the jail, and the workspace inside of the jail is extremely small.

Cole typically takes prisoners to the FHP Station prior to taking them to the county jail if he has a lot of paperwork to complete. Cole always takes prisoners into the conference room if he takes them to the FHP Station.

When they arrived at the FHP Station, Cole noticed that Maudsley had removed a handcuff from one of her hands. Cole reapplied the handcuff, with her hands behind her back, and double locked the handcuff.




**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

Cole was shown a photograph of the conference room and was asked to indicate where he and Maudsley were sitting (**Exhibit #5**). Cole was sitting at a table in between Maudsley and the exit door. Cole could see Maudsley from where he was sitting. Sergeant Ada came into the conference room and watched Maudsley so Cole could use the restroom. Cole returned and Ada left the conference room.

While Cole was completing his paperwork, he felt a "presence" moving from his right to his left. Cole looked to his left and saw Maudsley at the exit door of the conference room. Cole asked Maudsley, "Where are you going" and whistled as he was getting up from his chair. Cole began running towards Maudsley. As Cole reached the conference room's exit door, Maudsley had already reached the exit door of the FHP Station. The door slowed Maudsley down and Cole was able to close in. Maudsley made it out of the exit door as the door was closing on Cole. Cole pushed the door open and drew his ECD. During the interview, Cole stated, "Knowing once she gets outside of our station, its open area...there's no secure sally point, port, um, there's the roadways out there, there's our parking lot, it's very heavily traveled, US 19 is a horrible road. Um, the first thing I think is she's going to US 19, if she makes it there, you know, there's no winning." Once Cole made it out the exit door, he saw Maudsley turning towards US 19. Cole described US 19 as a very congested roadway with many businesses including Wal-Mart and another large mall in the immediate area.

Cole did not want to jump on Maudsley since he was three times her weight. Cole stated that he knew that if he jumped on her, that one or both of them would get injured. Cole aimed his ECD at Maudsley and fired the probes into her back. Maudsley was running "full gallop" prior to the ECD taking effect. Maudsley fell down onto her buttock and then head when the ECD took effect.

When asked what he (Cole) was thinking as Maudsley made it through the exit door, Cole stated, "I can't let her get out and get run over." When asked why he (Cole) chose the Taser to stop Maudsley, as opposed to any other take down maneuver or Aerosol Subject Restraint (ASR), commonly referred to as "pepper spray", Cole stated, "I felt that it was the least amount of force necessary to stop her." Cole stated that ASR would not have any effect because it would have been sprayed into the back of her head. Cole did not give a verbal warning prior to deploying the Taser because of the immediacy of needing to stop Maudsley. Cole did not consider that Maudsley could fall on the asphalt and injure herself. Cole mentioned that he had a previous successful ECD deployment where the subject was standing on concrete and did not sustain injury. Cole also felt that Maudsley could outrun him.

Once Maudsley raised her head up after she landed on the asphalt, Cole saw a small amount of blood and summoned EMS. Cole never left Maudsley's side. After she lost consciousness, Cole monitored her breathing by watching her chest rise and fall. Ada monitored her pulse. EMS arrived and took over treatment of Maudsley. Maudsley was still handcuffed, but the handcuffs were located in front of her instead of behind her back. Cole retrieved the probes and other pieces of the ECD, such as the cartridge doors, to submit to evidence.

When asked if, after looking back, would he have done anything differently, Cole stated, "No, I would not have." Cole personally felt that his actions were justified.

 

**Department of Highway Safety and Motor Vehicles**
**Office of Inspector General**

## Conclusion

On September 19, 2011, at 10:28 AM, Trooper Daniel A. Cole arrested Danielle C. Maudsley in Pinellas County for two counts of driving without a valid driver's license and two counts of leaving the scene of a crash with property damage. The arrest took place at Maudsley's residence where she had fled after being involved in two separate traffic crashes within the previous two hours.

Cole handcuffed Maudsley behind her back and placed her into his patrol car. Cole activated his in-car video camera and audio recording device. Cole transported Maudsley to the Florida Highway Patrol (FHP) Station in Pinellas Park so that he could complete his arrest paperwork. When Cole arrived at the FHP Station and retrieved Maudsley from the rear seat of the patrol car, he noticed that she had slipped her right hand out of the handcuff. Cole again handcuffed Maudsley behind her back and transported her inside the conference room of the FHP Station.

Once inside the FHP Station conference room, Cole positioned himself at a table in between Maudsley's chair and the conference room exit. At approximately 11:45 AM, while Cole was completing his paperwork, Maudsley ran past him out of the conference room, down a short hallway, to the exit door that led into the parking lot. Cole chased after Maudsley and drew his ECD as she ran out of the exit door, with her handcuffs positioned in front of her body. Cole pursued Maudsley out the exit door and fired his ECD striking her in the back, as she ran into the parking lot. After the probes struck Maudsley, her body rotated, she fell backwards and her head hit the asphalt.

Cole notified FHP dispatch via his portable radio that he used his ECD on Maudsley. Sergeant Raymond Ada and Trooper William Dyer, who were inside of the FHP Station, heard Cole's radio transmission and responded to assist. Cole also requested EMS due to Maudsley hitting her head on the asphalt. Maudsley initially responded after she fell to the ground by crying and trying to lift herself up. Cole told her to remain still. Approximately two minutes later, at 11:48 AM, Maudsley did not appear to move. Cole checked her breathing and Ada checked her pulse. Maudsley was breathing and had a pulse. At 11:51 AM, EMS arrived and began treating Maudsley. Maudsley was transported to Bayfront Medical Center by EMS.

At approximately 5:00 PM, the physician attending to Maudsley advised that her condition was critical and her prognosis was not good due to the lack of activity in her brain. In addition, Maudsley had oxycodone and cocaine in her system.

The Florida Department of Law Enforcement (FDLE) completed a criminal investigation into Cole's Use of Force on Maudsley. On November 7, 2011, FDLE concluded that Cole was in the legal performance of his official law enforcement duties and acted within the scope of his assignment.

During his interview with FDLE, Cole stated that he decided to use his ECD on Maudsley because he felt that she was more susceptible to being injured if he attempted to tackle her.

 **Department of Highway Safety and Motor Vehicles**
**Office of Inspector General** 

Cole weighs approximately 267 pounds without his duty belt and equipment. Cole had previously utilized his ECD on a subject with positive results. Cole believed that using the ECD on Maudsley was the least amount of force available to him in order to effectively stop her escape.

The investigation by the OIG determined that Cole acted in accordance with Florida law and FHP Policy, both of which state that a law enforcement officer is justified in the use of any force which he or she reasonably believes to be necessary to prevent the escape of an arrested person from custody. Although the FHP Policy on Electronic Control Devices states that a member should not use the device on a handcuffed prisoner, it also provides that there may be situations that conflict with this policy.

In this situation, Maudsley had previously fled two traffic crashes, removed one of her handcuffs while in the back of Cole's patrol car, and had moved her handcuffs from behind her back to in front of her body as she attempted to flee the FHP Station. In addition, Maudsley was running towards US Highway 19 which is a high volume roadway.

Based on all available evidence and sworn statements associated with this investigation, Trooper Daniel A. Cole's use of his Department issued TASER X26 on Danielle C. Maudsley was within policy.

Administrative Review – Florida Highway Patrol Trooper Use of Control - **EXONERATED.**

_____          1/10/2012
Signature of Inspector General          Date

This investigation was conducted in accordance with the Association of Inspectors General *Quality Standards for Investigations*. This report may contain information that is exempt from disclosure under applicable law. Do not release without prior coordination with the Office of Inspector General.